J-A29020-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| CHEYENNE A. HETRICK | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NATHAN J. MCCLINTOCK | : | No. 721 WDA 2022 |

Appeal from the Order Entered May 23, 2022
In the Court of Common Pleas of Clarion County Civil Division at No(s):
No. 1021 CD 2021

BEFORE:  BENDER, P.J.E., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY OLSON, J.:                **FILED: FEBRUARY 3, 2023**

Appellant, Cheyenne A. Hetrick ("Mother"), appeals from the order dated May 20, 2022, and entered May 23, 2022, in the Clarion County Court of Common Pleas, awarding Nathan J. McClintock ("Father") primary physical custody of his daughter, J.A.S. ("Child"), born in October 2016.  Upon careful review, we affirm.

The relevant facts and procedural history are as follows.  In May 2015, Mother married R.H. ("Stepfather"), and they separated that same year.  N.T., 5/10/22, at 143, 152-153, 182.  In late 2015 and early 2016, Mother began dating Father (collectively, "Parents").  *Id.* at 13, 143, 182.  Parents' romantic relationship lasted four months, during which time Mother conceived Child.  *Id.* at 13, 16.

In May 2016, Mother moved from Pennsylvania to Florida, where she gave birth to Child in October 2016, and Father remained in Pennsylvania. *Id.* at 16-18, 144. Mother filed for full custody of Child in Florida, and Father's paternity of Child was established during the pendency of the custody matter. *Id.* at 18-19. The custody case was subsequently dismissed when Mother expressed her intent to return to Pennsylvania. *Id.* at 19.

In October 2017, Mother and Child traveled to Pennsylvania, and Father had one overnight visit with Child. *Id.* at 20. The following month, Mother reconciled with Stepfather. As best we can discern, Mother and Child began residing with Stepfather in Marienville, Forest County, Pennsylvania at that time. *Id.* at 20-21, 182-183. Between November 2017 and June 2018, Father had one additional weekend visit with Child. *Id.* at 21. In 2018, Father moved into his parents' ("Paternal Grandparents") home in Rouseville, Venango County, Pennsylvania, where he continued to reside through the time of the subject proceeding. *Id.* at 3-4, 18, 54.

In June 2018, Parents entered an informal custody arrangement, wherein Father could visit Child every weekend. *Id.* at 21-23. At the time, Mother attended classes at Clarion University during part of the week. *Id.* at 23-25. Upon agreement, Father registered Child for daycare. *Id.* at 24-25. When Mother attended classes, Father picked Child up from daycare twice a week, and those weekday custodial times typically lasted a "couple hours." *Id.* at 23-24.

In January 2019, Mother commenced a custody action in the Court of Common Pleas of Forest County. *Id.* at 25. By order dated February 25, 2019, and entered March 6, 2019, the trial court awarded Parents shared legal custody and shared physical custody as determined by mutual agreement of the parties. Around Easter weekend of 2019, Parents had a disagreement about the time that Father was to return Child to Mother at the conclusion of Father's weekend visit. *Id.* at 25. Father returned Child to Mother past the agreed upon drop-off time. *Id.* at 26.

In April and May 2019, respectively, Parents filed cross-petitions for modification of the custody order.[1] By consent order entered on July 26, 2019 ("existing custody order"), the trial court awarded Parents shared legal custody, Mother primary physical custody, and Father partial physical custody three out of four weekends per month and at other times based on mutual agreement. Order, 7/26/19, at 2. In addition, the court awarded Parents physical custody for two nonconsecutive weeks each year and holidays based on their agreement. The court further directed Parents to have reasonable contact with Child while she is in the physical custody of the other parent, and such contact may include telephone, email, text, or social media. *Id.* at 9.

_____

[1] Mother also filed a petition for civil contempt on April 29, 2019. Mother subsequently filed a motion to withdraw the petition, and the trial court granted the motion to withdraw.

In March 2020, Mother filed a petition for emergency custody, seeking to retain "emergency primary custody until [the] pandemic is under control." Mother's Petition for Emergency Custody, 3/25/20. At this time, Mother remained married to Stepfather and had bore him a son, who was then approximately seven months old. Following a hearing in April 2020, the trial court denied Mother's petition. In June 2020, Mother filed a protection from abuse ("PFA") petition against Father, alleging Father had abused Child. N.T., 5/10/22, at 29. However, the county children and youth services agency investigated the allegations and determined that they were unfounded. *Id.* at 29-30. No criminal charges were brought against Father, and the PFA was dismissed in October 2020. *Id.* at 30. During the pendency of the PFA petition, Father had supervised visits with Child two days a week, for one hour. *Id.* Once the PFA was dismissed, Father resumed his weekend custodial time. *Id.* at 31-32.

In August 2020, Mother separated from Stepfather, and she relocated with Child to the home of her mother ("Maternal Grandmother") in Clarion County, where they remained until approximately December 2020. *Id.* at 137, 161, 185, 212. In 2020, Mother made a Facebook post, stating in part, the following:[2]

And sometimes, maybe I did act crazy.

---

[2] As best we can discern, soon after her separation from Stepfather, Mother made the Facebook post about her relationship with Stepfather. N.T., 5/10/22, at 185-186.

- 4 -

I was emotionally and mentally abused for [six] years.

I moved 1600 miles to do this all over again.

. . .

I once went [fourteen] days without being spoken to.

. . .

I had PPD and was having suicidal thoughts, he sent me to my moms and broke up with me.

. . .

He threw things, broke things, sent me into panic attacks regularly.

. . .

He called me an addict for taking my prescribed medications.
He threatened to kill me more times than I can count, in front of nearly everyone I know. . . . I was spit on.  Then had a wallet thrown at my face.  I was charged at while 6 months pregnant.

Then I was grabbed up, with my life threatened.  In front of his mother.  And no one helped.  The only thing they cared about was the coffee cup I smashed afterwards.

Then, a knife was pulled, and I was bruised and thrown down a hallway with my life being threatened. In front of my family.
Then, I was blamed.
Told I did it to myself.
By everyone who swore I was their family too.  His mother included, who claims to be a victim of abuse herself.

He ran off [three] hours away after stealing every dime of food money, credit cards, and my child support.  And never saw his kids or tried to work something out.

Father's Exhibit C; N.T., 5/10/22, at 41-43.  According to Mother, Mother had

"harmed" herself around November 2020.  N.T., 5/10/22, at 197.

From December 2020 through October 2021, Mother and Child resided in a public housing apartment in Rimersburg, Clarion County. *Id.* at 137-138. The driving distance between Mother's Clarion County home and Father's home in Venango County was approximately one hour. *Id.* at 170. In 2021, upon the parties' agreement, Father exercised custody four weekends every month. *Id.* at 40. In approximately August 2021, Child was enrolled in pre-kindergarten. *Id.* at 204; Father's Exhibit F, at 5. Father picked Child up from preschool once a week, and those visits lasted a couple hours each. N.T., 5/10/22, at 40-41. In October 2021, Father stopped picking Child up due to a change in his work schedule. *Id.* at 10, 49-50, 123.

In October 2021, Mother was evicted from her Rimersburg apartment.[3] *Id.* at 44. Mother notified Father that she had been evicted and was considering a move to Indiana County. *Id.* at 44, 46-47. Father indicated he was not in agreement with Child moving to Indiana County and requested that Mother and Child remain in Clarion County. *Id.* at 47. According to Mother, later that month, Mother moved into Stepfather's home in Mansfield, in Tioga County, "to discuss options while waiting on housing." *Id.* at 194-195. Child

_____

[3] According to Father, Mother was residing in Rimersburg with a boyfriend. N.T., 5/10/22, at 31-33. Father introduced into evidence newspaper articles showing Mother and her boyfriend were charged with disorderly conduct, and Mother's boyfriend was charged with harassment on a separate occasion. *Id.* at 44-45; Father's Exhibit D. The record does not indicate the status of those charges.

was also withdrawn from preschool in late October 2021. *Id.* at 57, 204; Father's Exhibit F, at 5. In November 2021, Mother reconciled with Stepfather, and she and Child remained with him in Tioga County. N.T., 5/10/22, at 138-139, 153.

On October 29, 2021, Father filed a petition for emergency custody in the Forest County Court of Common Pleas and a petition to modify the existing custody order, requesting shared legal and primary physical custody. Father contemporaneously filed a petition to transfer the action to the Clarion County Court of Common Pleas, which was granted on November 24, 2021.

The evidentiary hearing on Father's petition for emergency custody occurred in the Clarion County Court of Common Pleas on January 18, 2022. By order dated January 18, 2022, and entered January 25, 2022, the trial court ordered an expedited hearing on: (1) whether a relocation has occurred; (2) whether relocation should be granted; and (3) whether Father's petition for modification should be granted.

The court held the subject hearing on May 10, 2022. Both Parents testified on their own behalf. The parties stipulated to the testimony of Child's paternal grandmother ("Paternal Grandmother"). N.T., 5/10/22, at 135. The parties also stipulated that Maternal Grandmother, who resides in Clarion County, would have testified, in part, that: Maternal Grandmother sees Mother and Child "a few times a month, on a regular basis," and that Mother and Child have visited Maternal Grandmother's house. *Id.* at 212-213.

- 7 -

Father testified he has been living with Paternal Grandparents in Venango County, and he does not plan to move out of their home due to his financial circumstances. *Id.* at 3-4, 54, 60, 107. When asked about the proximity between his home and Mother's residence in Tioga County, Father testified, "Three and a half hours. I can't remember the [mileage], one hundred and eighty-some miles, I think." *Id.* at 62.

Father testified that Mother never informed him about moving to Tioga County, and he found out only after Mother had moved. *Id.* at 53. Father testified that in November 2021, he had a FaceTime call with Child, and he saw Mother and Stepfather together on the couch. *Id.* He testified that at that point, he suspected Mother had not been truthful to him about resuming her relationship with Stepfather. *Id.*

Father testified he is presently self-employed, managing a tree service company that provides trimming, tree removal, and landscaping services, and he noted he has "variable" work hours. *Id.* at 9, 50. Father testified that during the winter of 2021, he worked at a welding shop in Warren, Ohio. *Id.* at 10, 49-50. Father testified he previously worked for six years at the maintenance department for the Department of Conservation and Natural Resources at Presque Isle State Park in Erie, Pennsylvania. *Id.* at 11.

Mother testified that she currently resides in a three-bedroom home in Tioga County with Child, Stepfather, and her two-year-old son with Stepfather. *Id.* at 137-140. She testified that Stepfather's twelve-year-old

daughter visits their home a couple times per month.  *Id.* at 138-139.  Mother testified that Child's maternal grandparents reside in Clarion County.  *Id.* at 161.  She testified that Child has contact with her maternal grandparents "at least weekly" but "sometimes more."  *Id.* at 162.

Mother testified that she was prescribed Adderall, Gabapentin, Effexor, Premarin, and Buspar to treat her depression, anxiety, attention deficit hyperactivity disorder ("ADHD"), and neuropathy.  *Id.* at 155-156.  She stopped taking her medications in October or November of 2021.  *Id.* at 156.

Mother testified that Child has a sensory processing disorder and is on the autism spectrum.  *Id.* at 173.  Mother testified she attends to Child's needs by learning about autism and helping Child calm down when she is over-stimulated.  *Id.*  Mother testified that Child receives Individualized Education Plan ("IEP") services on Mondays, for about one hour.  *Id.* at 159.  Mother testified that the recommendation from Child's IEP is for Child to receive therapy.  *Id.*

By opinion and order dated May 20, 2022, and entered May 23, 2022, the court found Mother had relocated and that the relocation was not in Child's best interests.  Further, the court granted primary physical custody of Child to Father and awarded partial physical custody to Mother.

On June 20, 2022, Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P.

1925(a)(2)(i) and (b). The trial court filed a statement pursuant to Pa.R.A.P.

1925(a), wherein it refers this Court to the May 23, 2022 opinion.

On appeal, Mother raises four issues, which we have reordered for ease

of disposition:

1. Whether the trial court committed an error of law and/or abused its discretion by finding that Mother's move constituted a relocation as defined by 23 Pa.C.S.A. § 5322?

2. Whether the trial court committed an error of law and/or abused its discretion in failing to find factors, 23 Pa.C.S.A. [§] 5328(a)(1), [(3), (4), (9), (10), (12), and (13)] favored Mother, where the evidence clearly showed that said factors favored Mother?

3. Whether the trial court committed an error of law and/or abused its discretion in failing to give proper weight to all things that affect the "best interest" of the child?

4. Whether the trial court committed an error of law and/or abused its discretion in finding that Mother's move would not serve the "best interests" pursuant to the 23 Pa.C.S.A. § 5337(h) factors?

Mother's Brief at 3-4 (suggested answers omitted).

We review Mother's issues according to the following scope and standard

of review:

[T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. . . . However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. . . . Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are

- 10 -

unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa. Super. 2009) (quoting *Bovard v. Baker*, 775 A.2d 835, 838 (Pa. Super. 2001)). Moreover,

[O]n issues of credibility and weight of the evidence, we defer to the findings of the trial [court which] has had the opportunity to observe the proceedings and demeanor of the witnesses.

The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

*R.M.G., Jr., supra* at 1237 (internal citations omitted). The test is whether the evidence of record supports the trial court's conclusions. *Ketterer v. Seifert*, 902 A.2d 533, 539 (Pa. Super. 2006).

*A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014).

We have explained, "It is not this Court's function to determine whether the trial court reached the 'right' decision; rather, we must consider whether, 'based on the evidence presented, giv[ing] due deference to the trial court's weight and credibility determinations,' the trial court erred or abused its discretion. . . ." *King v. King*, 889 A.2d 630, 632 (Pa. Super. 2005) (quoting *Hanson v. Hanson*, 878 A.2d 127, 129 (Pa. Super. 2005)). This Court has recognized that "the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court

by a printed record." ***Ketterer***, 902 A.2d at 540 (quoting ***Jackson v. Beck***, 858 A.2d 1250, 1254 (Pa. Super. 2004)).

With respect to custody cases, the primary concern is the best interests of the child. "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual wellbeing." ***Saintz v. Rinker***, 902 A.2d 509, 512 (Pa. Super. 2006) (quoting ***Arnold v. Arnold***, 847 A.2d 674, 677 (Pa. Super. 2004)).

Child custody actions are governed by the Child Custody Act ("Act"), 23 Pa.C.S.A. §§ 5321-5340. Section 5328 of the Act provides the following list of factors that a trial court is required to consider in determining the best interests of the child when awarding any form of custody:

**§ 5328. Factors to consider when awarding custody.**

**(a) Factors.** – In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a). "In any action regarding the custody of the child between the parents of the child, there shall be no presumption that custody should be awarded to a particular parent." 23 Pa.C.S.A. § 5327(a).

Additionally, when a custody action involves a relocation, "[t]he party proposing the relocation has the burden of establishing that the relocation will serve the best interest of the child as shown under the factors set forth in subsection (h)," which provides as follows:

**(h) Relocation factors.--**In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S.A. § 5337(h).

In matters involving both a custody determination and relocation decision, this Court has explained that the trial court is required to consider all of the factors listed in Sections 5328(a) and 5337(h) when entering a custody order. *A.V.*, 87 A.3d at 822 (citation omitted); *see also A.M.S. v. M.R.C.*, 70 A.3d 830, 836 (Pa. Super. 2013) (stating that, when making a decision on relocation that also involves a custody decision, "the trial court must consider all ten relocation factors and all sixteen custody factors" outlined in the Act). Moreover, "[i]n a custody action, it is within the trial court's discretion based on the record before it to determine the relevant weight to give each of the Section 5328(a) factors in a particular case." *T.M. v. H.M.*, 210 A.3d 283, 289 (Pa. Super. 2019) (citing *M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa. Super. 2013)).

Instantly, in its opinion accompanying the subject order, the trial court found that Mother relocated, as defined by 23 Pa.C.S.A. § 5322, when she moved from Clarion County to Tioga County, which is 180 miles away from Father's home in Venango County. Trial Court Opinion, 5/23/22, at 3-4. The court considered the sixteen best interest factors and the ten relocation factors and provided the reasons for its decision. *Id.* at 4-12. With respect to the best interest factors, the court found Section 5328(a)(2), (15), and (16) in favor of Father, while finding Section 5328(a)(6) in favor of Mother. *Id.* at 9-10, 12. The court found Section 5328(a)(2.1), (7), and (8) inapplicable. *Id.* at 9-11. The court found the remaining factors neutral in that Section 5328(a)(1), (3), (4), (5), (9), (10), (12), and (14) favored both Parents, and (11) and (13) did not favor either parent. *Id.* at 9-12.

With respect to the relocation factors, the trial court found Section 5337(h)(2) and (3) favored Father, while Section 5337(h)(6) slightly favored relocation. *Id.* at 5-7. The court found Section 5337(h)(1), (5), (7), and (8) neutral and Section 5337(h)(4) and (9) inapplicable. *Id.* at 5-7. Under Section 5337(h)(10), the court considered Mother's failure to provide reasonable notice of her proposed relocation. *Id.* at 8. The court concluded that Mother's relocation would not serve the best interests of Child. *Id.* at 9. The court awarded primary physical custody to Father and partial physical custody to Mother.

Turning to the merits of the appeal, in her first issue, Mother claims the trial court erred in finding that Mother relocated to Tioga County because Mother's move did not impact Father's involvement with Child. Mother's Brief at 18-22. Specifically, Mother notes that prior to moving, she and Father lived one hour apart and never lived in the same school district or county. *Id.* at 22. She further asserts Father had daily phone calls with Child after he filed his petition to modify in October 2021, and he continued to see Child during his periods of partial custody. *Id.* at 20-21. We are not persuaded by Mother's argument.

As an initial matter, in cases involving statutory interpretation, this Court has held:

> [T]he interpretation and application of a statute is a question of law that compels plenary review to determine whether the court committed an error of law. As with all questions of law, the appellate standard of review is *de novo* and the appellate scope of review is plenary.

**C.B. v. J.B.**, 65 A.3d 946, 951 (Pa. Super. 2013) (quoting **In re Adoption of J.A.S.**, 939 A.2d 403, 405 (Pa. Super. 2007)).

The Act defines a relocation as, "[a] change in a residence of the child which significantly impairs the ability of a nonrelocating party to exercise custodial rights." 23 Pa.C.S.A. § 5322(a). The Act provides that no relocation shall occur without the consent of every individual who has custody rights to the child to the proposed relocation or court approval of the proposed relocation. 23 Pa.C.S.A. § 5337(b). Further, the party proposing the

relocation is required to notify every other individual who has custody rights to the child.  23 Pa.C.S.A. § 5337(c).

> The trial court found:
>
> In the present case, Mother moved to Mansfield, Tioga County, Pennsylvania, late last year, approximately 180 miles and a three[-]and[-]one[-]half[-]hour drive from Father's residence in Rouseville, Venango County, Pennsylvania.  Prior to that time, Father was actively involved in the Child's life.  Beginning in June 2018, he saw her on a regular basis.  There was no court [o]rder. He saw her every weekend.  Mother started to attend college classes and Father saw the Child more than on just weekends; he saw her two times per week during the weekdays for a couple of hours.  Father registered the Child for daycare at the Child Development Center because of Mother's work schedule and to help her out.  Father often picked her up at daycare.
>
> The parties began having difficulty communicating and they engaged in various court proceedings which resulted in several court Orders for custody.  In early 2021, communications and co-parenting improved, and Father got additional time.  He had custody on most weekends, and he picked the Child up at daycare and had her for a couple of hours at least once per week.
>
> Father has participated with the Child in many family activities and in outdoor activities, including hiking, snowboarding and rock wall climbing, as depicted in the photos in Defendant's Exhibit I.
>
> This evidence shows that Father has had regular and continued involvement co-parenting in different aspects of the Child's life that go beyond his periods of partial physical custody as prescribed by court [o]rders.  With a distance between residences of about 180 miles and one-way travel time of about three and one[-]half hours, the consistency and frequency of Father's involvement would be broken, threatening significant impairment of Father's ability to exercise his custodial rights.  Therefore, the move by Mother is a "relocation."

Trial Court Opinion, 5/23/22, at 3-4 (cleaned up).

The record supports the trial court's finding of a relocation. Mother testified that her prior residence in Clarion County was one hour from Father's residence. N.T., 5/10/22, at 170. Father testified that Mother's new residence in Tioga County is three and one-half hours or 180 miles from his residence. *Id.* at 62. Father testified that when Mother attended college and Parents agreed on an informal custody arrangement in 2018, Father registered Child for daycare and picked Child up from daycare twice a week during Mother's class times. *Id.* at 21-24. Father testified that these weekday visits lasted a couple hours. *Id.*

The existing custody order granted Father overnight weekend custodial time for three weekends per month, as well as any additional time that is mutually agreed upon by the parties. Order, 7/26/19. Upon agreement of the parties, Father had overnight weekend custody four weekends out of the month. N.T., 5/10/22, at 40. After Child's enrollment in preschool in August 2021, Father testified that he picked Child up from preschool once a week for "a couple hours," taking her out to eat and driving her back to Mother's home in Clarion County. *Id.* at 40-42; Father's Exhibit F, at 5. On cross-examination, Mother agreed that Father has been actively involved with Child since June 2018. N.T., 5/10/22, at 209.

Father acknowledged that he stopped picking Child up from preschool in October 2021 due to a change in his work schedule at his previous welding job. *Id.* at 10, 49-50, 123. However, Father is now self-employed operating

a tree service business, which affords a flexible work schedule. *Id.* at 9, 50. Further, the record demonstrates that Mother withdrew Child from preschool in late October 2021 when she and Child moved to Tioga County. *Id.* at 57, 204; Father's Exhibit F, at 5.

Mother claims that Father had greater contact with the Child after Mother's move to Tioga County because he participated in daily phone calls or video calls with Child, each lasting approximately fifty minutes to one hour. Mother's Brief at 20-21. Mother's claim is not persuasive. Although Father's ability to have reasonable contact with Child pursuant to the existing custody order was not impacted by the relocation, the record supports the court's finding that "the consistency and frequency of Father's involvement would be broken, threatening significant impairment of Father's ability to exercise his custodial rights." Trial Court Opinion, 5/23/22, at 4. Therefore, the trial court properly concluded that Mother had relocated.

In support of its decision, the trial court cites *C.M.K. v. K.E.M.*, 45 A.3d 417 (Pa. Super. 2012). Trial Court Opinion, 5/23/22, at 2-3. To the extent that Mother contends that *C.M.K.* is inapplicable here, Mother's contention fails. In *C.M.K.*, the mother proposed to move to a location approximately sixty-eight miles from the father's residence. 45 A.3d at 420. This Court in *C.M.K.* affirmed the trial court's finding that mother's proposed move constituted a relocation because it significantly impaired the father's ability to exercise his custodial rights. *Id.* at 426. The trial court found that the father

had regular and continued involvement in co-parenting the child that went beyond his periods of partial physical custody. *Id.* Specifically, the father was involved in the child's school activities, medical appointments, and sports events, and had a desire to coach the child. *Id.*

The record here provides greater support for the trial court's finding that Mother's move to Tioga County meets the statutory definition of a relocation. Compared to the sixty-eight miles in *C.M.K.*, Mother's move to Tioga County resulted in a distance of 180 miles from Father's residence, equivalent to a one-way drive time of three and a half hours. Additionally, Father here was actively involved in Child's life since June 2018, having overnight weekend custody and exercising custodial time after Child's daycare and preschool activities concluded.

Mother's reliance on *G.R.S. v. M.L.S.*, 236 A.3d 1089 (Pa. Super. 2020) (unpublished memorandum) to challenge the trial court's finding is misplaced, as that case is distinguishable.[4] This Court in *G.R.S.* found that a mother's move to a location thirty minutes away from the father's home was not a relocation because it did not significantly impair the father's ability to exercise custody of the child. 236 A.3d 1089, at *6. Unlike *G.R.S.*, Mother's new residence in Tioga County is three and one-half hours from Father's residence.

---

[4] In accordance with this Court's Operating Procedure § 65.37, a non-precedential decision of this Court filed after May 1, 2019, may be cited for its persuasive value, pursuant to Pa.R.A.P. 126(b). 210 Pa. Code § 65.37(A).

N.T., 5/10/22, at 62. The distance between the parties' residences in **G.R.S.** is not comparable to the distance in the present case.

Citing **D.K. v. S.P.K**, 102 A.3d 467 (Pa. Super. 2014), Mother contends that a change in the custody order is not necessary for the parties to maintain their respective rights and Mother had not requested any changes in the schedule. Mother's Brief at 27. However, the facts in **D.K.** are distinguishable from the instant case. The **D.K.** court specifically held that in a custody case "where neither [m]other nor [f]ather is relocating and only the children stand to move to a significantly distant location, the relocation provisions of the Child Custody Act, 23 Pa.C.S.A. § 5337, are not *per se* triggered and the notice requirement of section 5337(c) does not apply." **D.K.** 102 A.3d at 468. The court further stated, "In a case such as this, where both parents remain in their established residences, there are no changed circumstances to assess." *Id.* at 473. Unlike the parties in **D.K.**, Mother in the instant matter changed her geographic location when she relocated 180 miles away from Father's home. Contrary to Mother's contention, the record supports the trial court's finding that Mother's move to Tioga County meets the statutory definition of a relocation. We discern no error or abuse of discretion by the trial court.

In her second issue, Mother contends the trial court erred or abused its discretion in finding neutral the following factors: Section 5328(a)(1), (3), (4), (9), (10), (12), and (13). Mother's Brief at 37-39. Here, the trial court set forth its consideration of Section 5328(a)(1), (3), (4), (9), (10), (12), and

(13) and found these factors neutral as to both Parents. The court found both Parents are likely to permit frequent and continuing contact with Child under Section 5328(a)(1). Trial Court Opinion, 5/23/22, at 9. The court found both Parents adequately performed parental duties, and both can meet the need for stability and continuity in the Child's education, family, and community life, pursuant to Sections 5328(a)(3) and (4). Regarding Section 5328(a)(9), the court determined both parents are equally likely to maintain a loving, stable, consistent, and nurturing relationship with Child. The court found both Parents can attend to Child's needs and are available to care for Child and make appropriate childcare arrangements, with respect to Section 5328(a)(10) and (12). *Id.* at 11. With regards to Section 5328(a)(13), the court found "[t]here is a level of conflict between the parties which prevents effective communication," but the court did not find this factor in favor of or against either parent. *Id.* at 12.

Mother emphasizes that she is a stay-at-home mother who would be able to attend to Child's needs. Mother's Brief at 38-39. This is particularly relevant to Sections 5328(a)(10) and (12), which, respectively, pertain to which party is more likely to attend to the child's daily needs and a party's availability to care for the child or to make appropriate childcare arrangements. 23 Pa.C.S.A. § 5328(a)(10), (12). Father testified that he believed both he and Mother can attend to Child's physical, developmental, and educational needs, though he believed he is more likely to attend to

Child's emotional needs. N.T., 5/10/22, at 95. Father testified that when he is working, he would rely on Paternal Grandparents to provide childcare. *Id.* at 63. While Mother argues she would be a stay-at-home mother, the record reflects, from Mother's own testimony, that she relies on a baby-sitter when needed. *Id.* at 162, 201. Mother also testified that she believed Father is a "good dad" and that both she and Father can provide for Child's daily physical needs. *Id.* at 147, 202-203. In turn, the trial court was well within its discretion when it found these factors neutral.

Additionally, we find that Mother's argument that the court did not properly consider the remaining Section 5328(a) factors to be without merit. Mother fails to put forth any argument with citation to the record showing that the court's conclusions with respect to the remaining best interest factors at issue are unreasonable or unsupported by the record. Essentially, Mother is asking this Court to reweigh the evidence and credibility determinations made by the trial court. This we cannot do. The trial court cited each custody factor, determined whether the factor was neutral, inapplicable, or weighed in favor of Mother or Father, and provided its reasoning. Trial Court Opinion, 5/23/22, at 9-12. The trial court's findings of fact and determinations regarding credibility and weight of the evidence are not to be disturbed absent an abuse of discretion. *E.R. v. J.N.B.*, 129 A.3d 521, 527 (Pa. Super. 2015); *C.R.F. v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012); *King*, 889 A.2d at 632. We discern no error or abuse of discretion by the trial court.

In her third issue, Mother argues that the Section 5328 best interest factors overall favored Mother. Mother's Brief at 34-36. Specifically, she claims that the trial court improperly considered Mother's failure to provide notice of her relocation when it analyzed Section 5328(a)(16), and that no other factors favored Father. *Id.* at 34. Mother claims that the court imposed a sanction against Mother rather than conducting a best interest analysis. *Id.* at 37. We do not find Mother's argument persuasive.

Contrary to Mother's assertion, in addition to Section 5328(a)(16), the trial court found that Section 5328(a)(2) and (15) weighed against Mother. Under Section 5328(a)(2), the trial court is required to consider "the present and past abuse" committed by a party or a party's household member, "whether there is a continued risk of harm to the child or an abused party," and "which party can better provide adequate physical safeguards and supervision of the child." 23 Pa.C.S.A. § 5328(a)(2).

Here, the trial court noted that "Mother previously stated that Stepfather had abused her, but she partially recanted her statements at trial." Trial Court Opinion, 5/23/22, at 9. The court explained it was "concerned about the current stability" of Mother and Stepfather's relationship given its unstable history. *Id.* The trial court's stated concern regarding the stability of Mother's current relationship reveals that it found this best interest factor against Mother.

The record supports the trial court's finding with respect to Section 5328(a)(2). After her separation from Stepfather in 2020, Mother made a Facebook post about her relationship with Stepfather. N.T., 5/10/22, at 41; Father's Exhibit C. In the post, Mother stated that Stepfather "threw things, broke things" and sent her into "panic attacks regularly." Father's Exhibit C. She further stated that Stepfather called her "an addict" for taking her prescribed medications, threatened to kill her, spat on her, threw a wallet at her face, and charged at her while she was six months pregnant. *Id.*

At the subject proceeding, Mother testified that what she had written in the Facebook post is partly true and that she made statements on social media when she was depressed. N.T., 5/10/22, at 156, 186, 189. Mother testified that she had suicidal thoughts after separating from Stepfather. *Id.* at 187-188. Mother agreed that she "did act crazy," but she did not agree that she was emotionally and mentally abused. *Id.* at 186. Mother testified that Stepfather "threw things," "probably" broke things, and called her an addict for taking prescribed medications. *Id.* at 188-189. Mother testified that she and Stepfather were in a "bad fight" when she was pregnant, but she did not believe a knife was pulled on her. *Id.* at 190-191. Mother acknowledged that this is the third time that she and Stepfather formed a romantic relationship. *Id.* at 199. We find that the record supports the trial court's concern about the current stability of Mother and Stepfather's relationship.

We discern no abuse of discretion in the trial court's consideration of this factor against Mother.

In Section 5328(a)(15), the trial court considers the mental and physical condition of a party or a party's household member. 23 Pa.C.S.A. § 5328(a)(15). Here, the trial court stated that, in light of Mother's social media communications, it is concerned about Mother's mental health. Trial Court Opinion, 5/23/22, at 12. The trial court's concern regarding Mother's mental health demonstrates it found this factor against Mother.

The record supports the court's assessment of Section 5328(a)(15). Father testified that Stepfather contacted him with concerns "during their break-up" regarding Mother's mental health, self-harm, and drug use. N.T., 5/10/22, at 33. Father testified regarding a series of text messages that Mother sent to Stepfather, which included a picture of someone's arm bleeding from cutting. *Id.* at 36; Father's Exhibit A. The text message also contained the following communication that Mother wrote to Stepfather:

> Actually I lied. I am not doing okay at all honestly. Worse than before.
>
> . . . .
>
> Like[,] bad[,] bad. And I'm only showing you this because idk [sic]. Someone should know[,] I guess[,] before it gets too bad. Just in case. I'm still fighting every day. But idk [sic]. I don't wanna [sic] be me anymore. I'm so tired. My soul is tired. I'm a burden to literally everyone. . . .
>
> And no[,] I don't want you to be there for me right now. But if something happens[,] I just want you to know that I love you. And I'm trying. Hard. But idk [sic] if I can do it much longer. So

- 27 -

if someday I give up, just know that I'm fighting with literally every breath I have.

N.T., 5/10/22, at 37; Father's Exhibit A.

On cross-examination, Mother testified that she had suicidal thoughts when she separated from Stepfather, and that she had "harmed" herself in November 2020. N.T., 5/10/22, at 188, 197. Mother testified that she had been prescribed medications for depression, anxiety, and ADHD, but she stopped taking those medications in October or November 2021. *Id.* at 155-156. Thus, the record evidence supports the trial court's stated concern regarding Mother's mental health. We find no abuse of discretion by the trial court in finding this factor against Mother.

With respect to Section 5328(a)(16), the trial court is to consider any other relevant factor. 23 Pa.C.S.A. § 5328(a)(16). Pursuant to 23 Pa.C.S.A. § 5337(j), the court may consider a failure of a party to provide reasonable notice of relocation as:

> (1) a factor in making a determination regarding the relocation;
>
> (2) a factor in determining whether custody rights should be modified;
>
> (3) a basis for ordering the return of the child to the nonrelocating party if the relocation has occurred without reasonable notice;

23 Pa.C.S.A. § 5337(j).

Here, we discern no abuse of discretion by the trial court in considering Mother's failure to provide notice of relocation under Section 5328(a)(16). There is no dispute that Mother did not provide Father with reasonable notice

of relocation in violation of 23 Pa.C.S.A. § 5337(c) when she relocated to Tioga County, 180 miles from Father's residence. In this case, the record amply supports the trial court's analysis of the best interest factors of Section 5328, and the court appropriately found Section 5328(a)(2), (15), and (16) did not favor Mother.

In her fourth issue, Mother argues that the trial court did not adequately analyze the relocation factors, specifically Section 5337(h)(1), (2), (3), and (7). Mother's Brief at 29. We address each of these factors in turn.

With respect to Section 5337(h)(1), pertaining to the nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and the nonrelocating party, Mother contends that the trial court erred when it did not weigh this factor in favor of relocation. *Id.* at 31. Specifically, Mother asserts the court discounted the evidence showing that she has been Child's primary caretaker since birth, and Child has a close relationship with her younger brother, who also lives in Mother's home. *Id.*

The trial court here found that Section 5337(h)(1) did not favor either parent, and the record supports its finding. Trial Court Opinion, 5/23/22, at 5. The court explained, "The Child has very close relationships with both parents, with her sibling, and with the family members and friends of both parents." *Id.* Contrary to Mother's claim, the court expressly recognized that Child has a very close relationship with her sibling and Mother. *Id.* The record also supports the court's finding that Child has a very close relationship with

- 29 -

Father and his family members. Father testified that he has a very good relationship with Child, and that Child is generally well-behaved. N.T., 5/10/22, at 72-73. Father testified Child gets along with her extended family and has a good relationship with Paternal Grandparents. *Id.* 73. Father introduced into evidence photographs of Child with Father, her Paternal Grandparents, and her cousins. *Id.* at 74. Father testified that he has been involved in Child's life since June 2018, participates in overnight weekend visits with Child, and maintains daily phone contact with the Child. *Id.* at 79. Mother testified that Child's phone calls with Father last between one hour and one hour and thirty minutes. *Id.* at 151. Mother also testified that she believed Father is a "good dad" and that he has been actively involved in Child's life. *Id.* at 147, 209. The record supports the trial court's assessment that this factor does not favor either parent given Child's close relationships with both Parents, as well as extended family members.

With respect to Section 5337(h)(2), which considers the child's age, developmental stage, and needs, and the likely impact of relocation on the child's development, Mother claims that the court did not adequately consider the impact on Child's development. Mother's Brief at 30. We disagree. The trial court weighed this factor in favor of Father, noting that while Mother was Child's primary caregiver, Father assisted with childcare responsibilities when he was not working. Trial Court Opinion, 5/23/22, at 5. The court found that Child will depend on both Parents for her basic daily needs. *Id.* The court

determined that relocation would have a negative impact on Child's physical, educational, and emotional development in that the consistency and frequency of Father's involvement will be broken. *Id.*

The record supports the trial court's finding. Prior to Mother's move to Tioga County, Father participated in overnight weekend visits with Child, and spent time with Child one or two times per week when he picked her up from daycare and preschool. N.T., 5/10/22, at 24, 39-40. Father testified that he has a very good relationship with Child. *Id.* at 72-73. Significantly, Mother testified she believed Father is a "good dad" and that he is "loving and nurturing," though she did not believe him to be stable or consistent. *Id.* at 147, 166. While Father participated in daily phone contact with Child since Mother's relocation, there is no evidence that Father would be able to maintain the frequency and consistency of in-person custodial time with Child given Mother's relocation 180 miles from his home. Thus, we find no abuse of discretion regarding this factor.

With respect to Section 5337(h)(3), which pertains to the feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, Mother argues that the parties would be able to maintain custody in their consent order. Mother's Brief at 30. Here, the trial court stated that "[f]or reasons previously stated, this factor weighs against relocation." Trial Court Opinion, 5/23/22, at 6. Earlier in its opinion, the trial court stated:

With a distance between residences of about 180 miles and one-way travel time of about three and one half hours, the consistency and frequency of Father's involvement would be broken, threatening significant impairment of Father's ability to exercise his custodial rights.

*Id.* at 4. We discern no abuse of discretion.

Regarding Section 5337(h)(7), Mother claims the trial court did not specify whether this factor is neutral or weighed against relocation. Mother's Brief at 30. Mother asserts that the court did not address the evidence that Child moved from a public housing apartment to a three-bedroom home and that the improvement of Mother's financial situation would enhance the Child's quality of life. *Id.*

Section 5337(h)(7) requires the trial court to consider whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity. 23 Pa.C.S.A. § 5337(h)(7). Here, the trial court provided the following reasoning:

The Child will not benefit financially because both parents can now provide financial support. The Child will benefit emotionally if Mother is happier, however, the move will also be detrimental to her emotional wellbeing because Father will lose access to share in her educational and other activities. There is no convincing evidence that the school system in Mansfield is better than that in the Rouseville area.

Trial Court Opinion, 5/23/22, at 7. While the court did not expressly state its conclusion, it is evident from the court's analysis that it determined this factor to be neutral.

The record supports the trial court's consideration of Section 5337(h)(7). Mother testified that she has an extremely close bond with Child, and she believes her current home in Tioga County is "substantially better" than the public housing in Clarion County. N.T., 5/10/22, at 166-168. Mother also testified that she assists Stepfather with a car detailing business from their home, and she is working on obtaining a notary license. *Id.* at 158-159.

Additionally, Father testified that he and Child have a very good relationship. *Id.* at 73. Father testified that he is self-employed as he operates a tree service company and previously worked at a welding shop. *Id.* at 9. Father testified that he has "four jobs lined up" and has "estimates scheduled in the coming weeks." *Id.* at 129. Mother acknowledged that Father was actively involved in Child's life since June 2018, outside of the pendency of the PFA. *Id.* at 209. Mother testified that Father is loving and nurturing, though she does not believe he is stable or consistent. *Id.* at 166, 173. The record demonstrates that both Parents have a source of income, which supports the trial court's finding that Child will not benefit financially as both Parents can provide financial support. The record further demonstrates that both Parents have a close relationship with the Child. Thus, the trial court appropriately found this factor neutral.

Accordingly, we discern no error or abuse of discretion by the trial court in finding that Mother's relocation would not be in Child's best interest and in awarding primary physical custody to Father.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  2/3/2023